# EXHIBIT 7

*FINAL COPY FOR EXECUTION*

## TRADEMARK LICENSE AGREEMENT

This **TRADEMARK LICENSE AGREEMENT** (the "Agreement") is made and entered into as of this 2nd day of May, 2019 (the "**Effective Date**"), by and between **Blacksmith OTR, LLC**, a limited liability company organized under the laws of Georgia ("Licensor") and **OTR Wheel Engineering, Inc.**, a corporation organized under the laws of Georgia ("Licensee").

WHEREAS, Licensor owns all right, title, and interest to the trademarks identified and set forth in Schedule 1 annexed hereto and made a part hereof (collectively, the "**Licensed Marks**");

WHEREAS, Licensor owns molds used to manufacture products to be resold bearing the Licensed Marks;

WHEREAS, simultaneously with the execution of this Agreement, Licensor and Licensee are signing a Settlement Agreement and Mutual Limited Releases (the "Settlement Agreement") to which this Agreement will be attached;

WHEREAS, Licensee wishes to use the Licensed Marks on and in connection with the sale, and offer for sale, of the products and services currently manufactured and distributed by Licensee and its Affiliates that are branded with or otherwise use the Licensed Marks as of the Effective Date, and any improved, modified or enhanced versions thereof or successors to any of the foregoing (collectively, "**Licensed Products**") (the license terms of each of which are set forth in Schedule 2);

WHEREAS, Licensee wishes to obtain from Licensor, subject to the terms and conditions set forth in this Agreement, the right and license to use and have used the License Marks on and in connection with the use, manufacture, sale, offering for sale, advertising, import, and export of the Licensed Products (the "**Licensed Purpose**");

WHEREAS, Licensor is willing to grant such rights, upon the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1. **GRANT AND SCOPE OF LICENSE**

    (a) **Grant of License.** Licensor hereby grants to Licensee the limited licenses to use and have used the Licensed Marks on and in connection with the Licensed Products under the terms set forth in Schedule 2.

    (b) **Goodwill.** Licensee expressly recognizes and acknowledges that its use of the Licensed Marks shall inure solely to the benefit of Licensor, and shall not confer on Licensee any ownership rights to the Licensed Marks. Licensee agrees and covenants that it shall not

challenge, contest, or take any actions inconsistent with Licensor's exclusive rights of ownership of the Licensed Marks.

(c) **Trademark Notices.** All print and electronic displays of the Licensed Marks, including displays on goods, by Licensee shall include at Licensor's request and to the extent reasonably practicable, a notice to the effect that the Licensed Marks is owned by Licensor and used by Licensee under license from Licensor.

(d) **Licensee Cooperation.** Licensee agrees to reasonably cooperate with Licensor in achieving registration of the Licensed Marks worldwide, and in maintaining and protecting existing registrations therefor, all at Licensor's sole expense. Licensee shall execute any and all documents which Licensor may reasonably request in support of such registrations, and, at Licensor's request, Licensee shall provide use evidence, testimony, and documentation that may be required in any *ex parte* or *inter partes* administrative proceedings and prosecutions, maintenance and renewals involving registrations of the Licensed Marks, all at Licensor's sole expense.

(e) **Quality Control and Licensor Approvals.** Licensor as owner of the Licensed Marks shall have the right to inspect Licensee's business operations upon reasonable prior notice for the purpose of ensuring that a high level of quality of the Licensed Products is being maintained by Licensee. At Licensor's reasonable request during each calendar year, Licensee shall submit samples of Licensed Products to Licensor, at no cost to Licensor, and shall not materially depart therefrom without Licensor's prior express written consent. No more frequently than once per year, at the sole expense of the Licensor, a third party auditor chosen by Licensor and approved by Licensee, such approval not to be unreasonably withheld, shall be entitled at any time on reasonable notice to the Licensee to enter, during regular business hours, any premises used by the Licensee or its manufacturers for the manufacture, packaging, storage, or performance of the Licensed Products, to inspect such premises, all plant, workforce and machinery used for manufacture, packaging, storage, or performance of Licensed Products and all other aspects of the manufacture, packaging, storage, and performance of Licensed Products ("Access Rights"). Prior to exercising such Access Rights, the third party auditor shall enter into a nondisclosure agreement with Licensee that, among other terms deemed acceptable by Licensee and such third party auditor, shall: (a) limit the content of any report made by the third party auditor to Licensor to a description of the manner in which, and the conditions under which, the Licensed Marks is used by Licensee or its manufacturers; and (b) prevent the disclosure of any of Licensee's trade secrets and/or Confidential Information. The Licensed Products shall be of a quality commensurate with previous products and services bearing the Licensed Marks provided by Licensee. If the quality of a class of the Licensed Products falls below such standards, Licensee shall use commercially reasonable efforts to restore such quality. In the event that Licensee has not taken appropriate steps to restore such quality within ninety (90) days after notification by Licensor, Licensor shall have the right to terminate this Agreement.

2. **ENFORCEMENT OF INTELLECTUAL PROPERTY**

(a) **Third Party Infringement.** In the event that Licensee becomes aware that any third party is infringing the Licensed Marks, Licensee shall promptly notify Licensor and provide

2

pertinent details. Licensor shall have the right in its sole discretion to bring a legal action for infringement against the third party, together with the right to enforce and collect any judgment thereon. If Licensor elects to exercise such right, Licensee shall, at Licensor's request, provide reasonable assistance to Licensor, at the sole expense of Licensor. In the event that Licensor declines to bring a legal action for infringement against a third party operating in the tire business identified by Licensee, Licensee shall have the right to bring a legal action for infringement against the third party upon receiving the prior written approval of Licensor, such approval not to be unreasonably withheld.

### 3. INDEMNIFICATION

(a) Licensee shall defend, indemnify and hold harmless Licensor and its officers, directors, employees, agents, corporate subsidiaries, parents, and affiliates ("**Licensor Indemnitees**") from and against any and all third party demands, claims, actions or causes of action, or resulting assessments, deficiencies, damages, losses, liabilities and expenses (including, without limitation, reasonable expenses of investigation and attorneys' fees and expenses), awarded in judgment or agreed in settlement, incurred in conjunction with or arising out of or relating to any third-party claim concerning Licensee's manufacture and sale of the Licensed Products and Licensee's performance of its obligations under this Agreement; provided, however, in no event shall Licensee's obligations under this Section 3(a) apply with respect to any third party claim that the Licensed Marks (including the use thereof in accordance with the terms of this Agreements) infringe, violate or misappropriate the trademark rights of any third party. As a condition to the foregoing, the Licensor Indemnitees agree to cooperate with Licensee, at Licensee's expense, to provide copies of any documents or materials reasonably requested by Licensee in support of its defense of the Licensor Indemnitees, and grant Licensee sole control over the defense and settlement of any such matter.

### 4. TERM AND TERMINATION

(a) **Term.** The Term of this Agreement will commence on the Effective Date and shall continue for the time periods set forth in Schedule 2 unless sooner terminated in accordance with Section 4(b) or 4(c) of this Agreement.

(b) **Termination for Breach.** Licensor and Licensee will be entitled to terminate this Agreement by written notice to the other party in the event the other party is in material breach of any of its obligations hereunder and shall fail to remedy any such default within ninety (90) days after notice thereof by the non-breaching party.

(c) **Termination Upon Bankruptcy.** Either party may terminate this Agreement by written notice to the other in the event of: (a) the other party's making assignment for the benefit of its creditors or filing a voluntary petition under any bankruptcy or insolvency law, under the reorganization or arrangement provisions of the United States Bankruptcy Code, or under the provisions of any law of like import; (b) the filing of an involuntary petition against the other party under any bankruptcy or insolvency law, under the reorganization or arrangement provisions of the United States Bankruptcy Code, or under any law of like import; or (c) the appointment of a trustee or receiver for the party or its property.

(d) **Survival of Obligations and Return of Information.** Notwithstanding any expiration or termination of this Agreement, Sections 3(a), 4(d), 5(a), 5(b), and 6(a) through 6(j) shall survive and continue to be enforceable as set forth herein. Upon any expiration or termination of this Agreement, Licensee shall promptly return to Licensor, or — at Licensor's direction, destroy — all confidential information and all copies thereof in Licensee's possession.

## 5. REPRESENTATIONS AND WARRANTIES

(a) Licensor represents and warrants to Licensee that Licensor's performance of its obligations under this Agreement is not in conflict with, and will not result in a breach of or constitute a default under, any other contract, instrument, rule of law or order of any court or governmental agency to which Licensor is a party or by which Licensor is bound.

(b) Licensee represents and warrants to Licensor that Licensee's performance of its obligations under this Agreement are not in conflict with, and will not result in a breach of or constitute a default under, any other contract, instrument, rule of law or order of any court or governmental agency to which Licensee is a party or by which Licensee is bound.

## 6. MISCELLANEOUS

(a) **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of Georgia without regard to its conflicts of law principles.

(b) **Waiver.** The waiver by any party of a breach or a default of any provision of this Agreement by any other party shall not be construed as a waiver of any succeeding breach of the same or any other provision, nor shall any delay or omission on the part of a party to exercise or avail itself of any right, power or privilege that it has or may have hereunder operate as a waiver of any right, power or privilege by such party.

(c) **Waiver of Jury Trial.** To the fullest extent permitted by applicable law each party hereby irrevocably waives all right of trial by jury in any action, proceeding, claim, or counterclaim arising out of or in connection with this Agreement or any matter arising hereunder.

(d) **No Agency.** Nothing herein shall be deemed to constitute Licensor, on the one hand, or Licensee, on the other hand, as the agent or representative of the other, or as joint venturers or partners for any purpose. Neither Licensor, on the one hand, nor Licensee, on the other hand, shall be responsible for the acts or omissions of the other. No party will have authority to speak for, represent or obligate the other party in any way without prior written authority from such other party.

(e) **Entire Agreement.** Together with the Settlement Agreement to which it is attached, this Agreement contains the full understanding of the parties with respect to the subject matter hereof and supersedes all prior understandings and writings relating thereto. No waiver, alteration or modification of any of the provisions hereof shall be binding unless made in writing and signed by the parties.

(f) **Headings.** The headings contained in this Agreement are for convenience of reference only and shall not be considered in construing this Agreement.

(g) **Notices.** All notices required or permitted hereunder will be in writing and will be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile transmission if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications will be sent to the party to be notified at the address as set forth below or at such other address as such party may designate by written notice to the other parties hereto. Notices shall be provided to the addresses set forth below:

If to Licensor:

Fred B. Taylor
Executive Manager
Blacksmith OTR, LLC
6 Riverside Industrial Parkway
Rome, GA 30161

With a copy to:

Camso Directors of BOTR
Camso USA Inc.
306 Forsyth Hall Drive
Charlotte, NC 28273-5873

If to Licensee:

Fred B. Taylor
President
OTR Wheel Engineering, Inc.
6 Riverside Industrial Parkway
Rome, GA 30161

(h) **Severability.** In the event that any provision of this Agreement is held by a court of competent jurisdiction to be unenforceable because it is invalid or in conflict with any law of any relevant jurisdiction, the validity of the remaining provisions shall not be affected and the invalid provision shall be severed herefrom.

(i) **Assignment.** This Agreement may not be assigned or otherwise transferred by Licensee in any manner without the prior written consent of Licensor in its sole discretion; provided, however, Licensee may assign this Agreement, in whole or in part, including its rights and obligations hereunder, to an Affiliate or to a purchaser in connection with the sale of its business (or the portion of its business to which this Agreement relates), in each case, without the prior written consent of Licensor, and subject to such assignee agreeing in writing to be bound by and subject to the terms of this Agreement. Licensor may freely assign any or all of its rights or obligations under this Agreement. Subject to the foregoing, this Agreement will inure to the benefit of and will be binding on the parties hereto and their respective permitted assigns.

(j) **Counterparts and Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original but all of such together shall

5

constitute one and the same instrument. Scanned PDF copies of signatures and facsimile copies of signatures may be deemed original signatures.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed by their respective authorized officers as of the Effective Date.

**BLACKSMITH OTR, LLC**

By: _____
Fred B. Taylor
Executive Manager

**OTR WHEEL ENGINEERING, INC.**

By: _____
Fred B. Taylor
~~President~~ Chairman

6

## SCHEDULE 1

All WEARMASTER, OUTRIGGER AND STABILIZER trademarks, service marks, brands and logos, now existing or hereinafter arising, including, without limitation, the following trademark registrations and applications (and any registrations which may be granted pursuant to such applications):

### United States

| Mark | Registration Number | Goods and Services |
|---|---|---|
| WEARMASTER | 2,365,742 | Class 012: tires for construction, industrial, agricultural and off-road vehicles |
| OUTRIGGER | 2,288,934 | Class 012: tires for construction, industrial, agricultural and off-road vehicles |
| STABILIZER | 2,640,897 | Class 012: tires for construction, industrial, agricultural and off-road vehicles |

### Canada

| Mark | Registration Number | Goods and Services |
|---|---|---|
| OUTRIGGER | 1870672 (Application) | Class 012: tires for construction, industrial, agricultural and off-road vehicles |
| STABILIZER | 1896194 (Application) | Class 012: tires for construction, industrial, agricultural and off-road vehicles |

### Europe

| Mark | Registration Number | Goods and Services |
|---|---|---|
| OUTRIGGER | 017198491 | Class 012: tires for construction, industrial, agricultural and off-road vehicles |
| STABILIZER | 017893673 | Class 012: tires for construction, industrial, agricultural and off-road vehicles |

7

## SCHEDULE 2

## LICENSE TERMS

1. The scope of the license includes the rights to use and have used the Licensed Marks (and any molds relating thereto for use in branding the License Products with the License Marks), including all common law rights and all U.S. and foreign trademark registrations and filings for OUTRIGGER, STABILIZER, and WEARMASTER, with respect to, and in conjunction with, the manufacture, offer for sale, sale, importation, exportation, promotion, advertising, branding, distribution, and provision of Licensed Products and such license is non-exclusive, worldwide and includes the right to sublicense to Licensee's subsidiaries and Affiliates. The license is transferable by Licensee in accordance with Section 6(i) of the Agreement.

2. "Affiliate" shall mean any natural or juristic person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, Licensee. The term "control" (including the terms "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

3. Licensor further grants Licensee the right to sublicense the Licensed Marks to any third party which is engaged by Licensee (including any of its subsidiaries and Affiliates) in the manufacture, supply or distribution of Licensed Products for or on behalf of Licensee solely to the extent of such third party's use of the Licensed Marks in connection with the manufacture, supply or distribution of Licensed Products for or on behalf of Licensee.

4. Nothing contained in this Agreement shall permit Licensee to breach or otherwise avoid its obligations under Section 1 of the Non-Competition, Confidentiality and Non-Solicitation Agreement made as of December 1, 1999, as amended by the Settlement Agreement.

5. The term of the license granted herein shall continue in effect until terminated in accordance with Section 4(b) or (c) of the Agreement, plus an additional 60-day sell through period thereafter.

6. The license granted herein shall not include any right for Licensee, nor any sublicensee, to use any corporate name, fictitious name, or other corporate identifier in the name of the Licensee that includes or comprises the Licensed Marks. Nothing herein shall be construed as prohibiting Licensee from making factually accurate statements concerning its contractual relationship with Licensor, provided that the wording of such statements shall be subject to Licensor's prior written approval, such approval not to be unreasonably withheld.

7. The license granted hereunder shall be royalty free for sales and other licensed uses made from the effective date through and including December 31, 2020.

8. For the license granted hereunder and for as long as this Agreement is in effect, for each Licensed Product sold by Licensee under one or more of the Licensed Marks **on or**

8

**after January 1, 2021**, Licensee shall pay to Licensor a royalty fee of 3% of Net Sales. "Net Sales" means the gross amount received by Licensee or any of its Affiliates for sales of Licensed Products during the applicable period, less any returns, rebates, discounts or adjustments, sales, excise, use or value-added taxes, costs of packing, insurance, transport and delivery, tariff duties, and freight and duty charges. Net Sales do not include sales of Licensed Products by Licensee to its Affiliates or sublicensees for resale.

9. Licensee will report to Licensor the royalty fee due to Licensor on a quarterly basis in any given year by completing a Royalty Report in a mutually agreed upon format. The Royalty Report will be delivered to Licensor along with payment in full of the royalty fees due for such completed quarterly period to Licensor, within forty-five (45) days following the end of each calendar quarter.

10. Licensee will keep, and permit to be examined by Licensor, or its employees, agents, and other representatives, an accurate record of the number of Licensed Products sold by Licensee or its sublicensees. Such records shall be maintained by Licensee for a period of at least three (3) years after the License Year to which such records pertain.

11. Net sales do not include, and no royalty shall be payable on, Licensed Products manufactured by Licensee and sold to Licensor.

12. For the avoidance of doubt, in the case of products manufactured by third-party manufacturers for resale by Licensee or its Affiliates, the payment of the royalty (if applicable) to Licensor will be made by the Licensee or the Affiliate involved in that resale.

9

*FINAL COPY FOR EXECUTION*

## FIRST AMENDMENT TO NON-COMPETITION, CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

This FIRST AMENDMENT TO NON-COMPETITION, CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT ("First Amendment") is made as of the 2nd day of May, 2019 between BLACKSMITH OTR, LLC (the "Company") and CAMSO USA INC. ("Camso").

### WITNESSETH:

WHEREAS, the Company and Swan International, Inc. ("Swan") entered into that certain Non-Competition, Confidentiality and Non-Solicitation Agreement as of December 6, 1999 (the "Agreement"); and

WHEREAS, Camso is the successor-in-interest to Swan under the Agreement; and

WHEREAS, the Company and Camso desire to amend the Agreement in the manner set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and intending to be legally bound hereby, the Company and Camso agree as follows:

1. <u>Definitions</u>. Unless otherwise expressly defined herein, all capitalized words and terms shall have the meaning ascribed to them in the Agreement.

2. <u>Amendment to Section 1 entitled Agreement Not to Compete</u>. Section 1 is hereby amended to include the following as Section 1(d):

   (d) Notwithstanding anything to the contrary contained herein, Camso shall be entitled to sell cured-on tires up to 15 inches in diameter to JLG Industries, Inc. ("JLG") and its affiliated companies which would otherwise be prohibited under subsections (a) through (c) above. With respect to any such sales made to JLG in the United States or Europe, Camso shall pay commissions to the Company in the amount of three percent (3%) of the net sales. These commissions will be paid on a quarterly basis on the 15th day of the month immediately following the end of the calendar quarter. No commission on sales in Europe will be due for sales occurring before April 1st, 2019.

3. Except as amended hereby, the Agreement remains unmodified and in full force and effect.

IN WITNESS WHEREOF, intending to be legally bound, the parties have executed this First Amendment as of the date first set forth above.

BLACKSMITH OTR, LLC

By: _____
Fred B. Taylor
Executive Manager


CAMSO USA INC.

By: _____
Robert Bulger
Chief Executive Officer